Jones, Chief Judge,
delivered the opinion of the court :
Plaintiff sues to recover $3,000 which the defendant is said to have improperly withheld from the final payment on a contract between the parties for the construction of a 16-mile water pipeline during 1943. This sum was retained by defendant on the ground that it was required to pay the claims of certain owners of property adjacent to the pipeline for injuries caused by plaintiff. The nature of the case requires a rather full statement of the facts.
Plaintiff is a Texas corporation engaged in the business of general construction contracting. By contract dated June 29, 1943, between plaintiff and defendant, the latter acting through the Federal Works Agency, it was agreed that plaintiff would construct a 36-inch cast iron water pipeline from Calallen to Corpus Christie, Texas, a distance of 16 miles. The plaintiff was to furnish all materials and perform the work in accordance with the specifications for the sum of $940,725. It was provided that the Government would furnish a right-of-way 50 feet in width and that any additional right-of-way or easements required should be provided by the contractor. This and other provisions relating to responsibility for damages due to the contractor’s negligence and various specifications here relevant are set out in detail in finding 3 and will be dealt with more specifically in connection with the various claims.
The defendant acquired title to an easement for a 50-foot right-of-way by filing “Declarations of Taking” in condemnation proceedings, but the question of compensation was not settled until after the completion of the contract, when settlement was made for the 50-foot permanent easement, damages to the surface on the 50-foot right-of-way, along with other claims against the Government as well as those against the contractor.
*687 Pursuant to its obligation under the contract to furnish engineering-architectural supervision of the construction, defendant employed the firm of Myers and Noyes, architect engineers, who acted in that capacity until completion of the contract. Actual day-to-day control of the work was carried out by plaintiff’s vice president, Mr. J. M. Dellinger.
The work was completed well within the contract time and on November 24, 1943, Myers and Noyes certified to the contracting officer, Federal Works Agency, that “* * * all work has been performed according to contract. We recommend * * * acceptance of the project and payment of the final estimate.” The pipeline was placed in use on December 8, 1943. Shortly thereafter the contracting officer’s assistant regional engineer advised plaintiff that $3,000 would be withheld from the final payment on the contract pending the disposition of the claims of five adjacent landowners for damage done by plaintiff beyond the 50-foot right-of-way. Plaintiff protested this action, contending that the contract had been complied with and any liability which it might have incurred to the landowners was the sole responsibility of plaintiff which defendant had no right to settle. At one point plaintiff offered its bond for $3,000 as assurance that recovery could be had against it for any legitimate claim. The bond was refused and defendant’s agents proceeded to settle various claims for lump-sum payments, irrespective of whether they were asserted against the Government or the contractor. Subsequent to these actual payments the F. W. A. officials in charge estimated the portion of the settlements which they regarded as allocable to plaintiff, and plaintiff was charged accordingly. The total so charged was $2,070, and plaintiff was offered the remaining $930 of the $3,000 withheld. This was refused on the ground that in settling these claims against plaintiff the defendant acted as a volunteer, and plaintiff was entitled to the full $3,000 withheld from the contract price. Pursuant to the dispute clause of the contract,[1] the matter was appealed to the Administrator, Federal Works Agency, who made findings of fact and *688 affirmed the action taken by the contracting officer.’ Suit in this court was subsequently instituted.
It is unquestioned that plaintiff is entitled to the full contract price unless, as defendant asserts, plaintiff breached the contract and damage to defendant resulted. Defendant contends that it has shown such a breach by plaintiff and that the damages suffered are represented in the amounts which it was obligated to pay the landowners. Having alleged a breach of contract, the burden is on the Government to prove damages, which in this case involves establishing that it was obligated, to pay the amounts expended. Spartan Aircraft Co. v. United States, 120 C. Cls. 327; General Steel Products Corp. v. United States (D. C. N. Y.), 36 F. Supp. 498; see also Anno, 38 A. L. R. 566, 589. It should be noted in passing that while defendant argues that certain portions of this case are exceptions to the general rule of liability in independent contract situations, the plaintiff’s status as an independent contractor is not in dispute.
Inasmuch as the amount deducted from the contract price was expended in five separate settlements, each involving somewhat distinct factual situations, we deem it expedient to deal with each in turn.
I. The Band Morgan Settlement
According to defendant’s evidence, Mr. Morgan owned, or represented owners of, five parcels of land through which the pipeline passed and on which an easement 50 feet wide and 1,191.2 rods in length had been obtained by the Government in the “Declaration of Taking” referred to, supra. Prior to the settlement here in question Mr. Morgan is alleged to have asserted claims to defendant’s investigators totaling $5,984.74, which a summary of the investigators’ records show to have been broken down as follows:[2]
*689 (a) 1,191.2 rods of 50-foot easement_$1,191.20
<b) Crop damage on 50-foot easement, one-half bale per acre at $128.50 per bale_ 1,452.05
(c) Crop damage on additional 30-foot strip used by contractor outside 50-foot right-of-way_ 866.09
(d) Clay on topsoil (over right-of-way)_ 225.40
(e) Cattle killed from eating poisoned cotton_ 500.00
<f) 35 acres of land flooded, crops lost due to interference with drainage- 1,750.00
Total- $5,984.74
It appears that this entire claim was settled by defendant for $4,044.09 and $1,070 of this amount was charged to plaintiff on the theory that plaintiff had (1) violated the contract by using a strip 80 feet in width rather than confining its work to the 50-foot right-of-way; and (2) violated the contract with defendant in that the backfill over the pipeline was left more than 6 inches high, thus causing the flooding of Mr. Morgan’s land. The defendant asks us to hold that it was obligated to pay this $1,070 to Mr. Morgan and that this obligation arose because of a breach of duty by the plaintiff. The evidence before us is insufficient to warrant such a holding.
Assuming, arguendo, that the two items of alleged injury mentioned above resulted from a breach of contract by plaintiff, we have no basis for arriving at a reasonable estimate of what defendant was in fact obligated to pay the landowner in settlement. There is no direct evidence on the extent of the injury actually suffered by Mr. Morgan, although the situation is not one in which some proof of actual damages would have been difficult to adduce. The facts[3] as found by the head of the department upon appeal are merely that the contractor used an additional strip 30 feet by 1,191.2 rods and that the backfill was riot leveled to a height of 6 inches. On the questions of what damage was done on the 30-foot strip; what crops, if any, were destroyed; the approximate amount and current value of such crops; the approximate area of the flooding and the crops destroyed thereby, the record is silent except for the alleged original assertions *690 of tbe landowners to the defendant’s field investigators as set out above from an exhibit of dubious evidentiary value and the stipulation as to the amount of money Morgan would have claimed had he testified. Manifestly we cannot find on such evidence that the settlement in this amount was reasonably required by defendant because of plaintiff’s dereliction. It is, of course, impossible for us to segregate the items of damage in the absence of even a rough estimate of actual damages incurred by Mr. Morgan. Defendant has apparently made no attempt to show the basis of the allocation. This gives rise to a strong inference that the allocation was purely arbitrary and renders it impossible to segregate the amount defendant was obligated to pay on its own account and that alleged to have been caused by the plaintiff. For failure of such proof the deduction of $1,070 cannot be allowed. Standard Accident Insurance Company v. United States, 102 C. Cls. 770; cert. den., 325 U. S. 870; General Steel Corp. v. United States, supra; Kolker v. United States, 40 F. Supp. 972 (D. C. Md.).
The record of this case discloses an additional circumstance surrounding all of the settlements here involved which we deem worthy of comment in the interest of proper perspective. At the time defendant was pressing for settlement of the landowners’ claim for alleged injury caused by plaintiff contractor, no settlement had been made with the same landowners for the easement acquired by defendant through the “Declarations of Taking.” Defendant’s attorney in charge of all negotiations and settlements with the landowners testified that his interest in settling all claims in a lump-sum payment was to avoid litigation on the easement, thus making the total cost to the Government as little as possible. The same sentiment is expressed in the “findings of fact” decision by the head of the department. While this was no doubt commendable prudence so far as the protection of the Government’s interest is concerned, it is not an impressive argument in justification of the payment of a lump-sum settlement without even an estimate of the actual damages, particularly where such payment is being charged to a third party. Deduction from the contract price for damages due to breach of contract must *691 be justified by some reasonable showing of what the actual damages were. General Steel Corp. v. United States, supra.
II. The Ira D. Magee Settlement
It appears from defendant’s evidence that Mr. Magee was the owner of parcel 6, through which the pipeline was constructed. Mr. Koons, the F. W. A. counsel who negotiated these settlements, testified for defendant and apparently relied largely on the summary from the field investigator’s records, which he made the day before the trial of this case, for the facts as to items originally claimed by Mr. Magee.
They are as follows:
(a) 183.92 rods of easement, 50 feet wide_$183.92
<b) 16 mesquite trees destroyed_ 320.00
(c) Damage to fences, failure to restore to original condition. 120.00
(d) Move concrete and fill sink hole_ 150.00
(e) Damage by reason of stock getting out (mule died)_ 80.00
Total_$853.92
In settlement of the above claims (apparently exclusive of the easement)[4] defendant paid Mr. Magee $289.08 and charged the entire amount to plaintiff. On appeal by plaintiff to the head of the department, that official found as fact that: (1) the contractor had broken up the concrete floor of Mr. Magee’s stock pen, which was on the right-of-way, and dragged the debris off the right-of-way leaving it on the adjacent land; (2) plaintiff paid Mr. Magee $100 to restore the stock pen as he wanted it; (3) Mr. Magee charged that a ridge 12 inches high was left over the pipeline except in one place where the ground settled, leaving a breach 6 to 12 inches deep and 15 feet long; for the removal of the concrete and the sinkhole the landowner asked $150; (4) that'Mr. Magee stated that although the contractor agreed to protect the mesquite trees forming a grove in his pasture (on the right-of-way) 16 were cut;[5] (5) that the trees were 15 to 20 *692 years old and valued at $20 each, or $820; (6) that the contractor failed to restore certain fences. The head of the department also made findings relative to the Government’s obligation to pay and plaintiff’s obligation to the Government under the contract, which are, of course, questions of law and not conclusive on us here. Callahan Construction Co. v. United States, 91 C. Cls. 538, 616; Rust Engineering Co. v. United States, 86 C. Cls. 461, 473.
As pointed out above, the propriety of deducting the $289.08 paid to Magee in settlement from the contract price otherwise due plaintiff depends on whether plaintiff was responsible therefor because of the breach of some duty owed defendant. We do not think the deduction is justified by the evidence.
While there can be little doubt that the Government was liable for any damage normally occurring on the right-of-way caused by the construction, defendant contends that plaintiff is liable for the destruction of the 16 mesquite trees because in destroying them plaintiff breached the following provision of the contract specifications:
CLEARING ANn GRUBBING
Clearing and grubbing shall consist of clearing the right-of-way of all trees, brush, rubbish, and other objectionable materials and grubbing within the lines of excavation.
*****
Where ornamented or other trees on the right-of-way are to he preserved,contractor shall protect the same from cuts and bruises.
Ornamental trees and shrubs or sod on or along the right-of-way shall be carefully protected from damage, and the Contractor shall employ the services of a nurseryman, approved by the Engineer, to care for any such shrubs or trees which may be damaged or which fail to show satisfactory life and growth during six months after completion of construction under this contract. [Emphasis supplied.]
The defendant has not shown a breach of this provision by plaintiff. It is clear that the contractor was required to clear the right-of-way of “all trees” except “where ornamental or other trees are to he preserved.” It seems gen *693 erally conceded that mesquite trees are not classed as ornamental in the area here involved, and plaintiff’s supervisor’s testimony that plaintiff was never advised that these trees “[were] to be preserved” is uncontradicted. The trees were cut with the approval of the architect-engineer whom defendant had employed to supervise the work on its behalf. We conclude that plaintiff could not properly be charged for the settlement of this item of damage between defendant and the landowner.
With respect to the remaining claims which Mr. Magee is alleged to have asserted to defendant’s investigators, we have essentially the same problem as was presented by the Morgan settlement, sufra. The head of the department merely found that Mr. Magee had made certain charges regarding the-ridge and sinkhole, but made no findings on which a reasonable estimate of the damages could be made. Likewise, the evidence regarding the stock pen floor is inadequate. It is established that plaintiff paid Mr. Magee $100 for certain adjustments on this item. There is no evidence, however, on whether this was paid before or after the $150 claim was asserted to defendant’s investigators. Also the question of segregation is again presented and for the reasons stated in the Morgan claim, sufra, we hold that the $289.08 paid to Mr. Magee cannot be allowed as a deduction from the contract price due plaintiff.
III. The Alva D. Strait Settlement
The claims originally asserted by Mr. Strait as reflected on the “summary” referred to above are as follows:
(a) 31.68 rods of 60-foot easement_$31.68
(b) Loss of garden, part on and part off the right-of-way_ 70.00
(e) Two days’ time protecting fence_ 15.00
(d) Repairs to fence_ 15.00
Total___$131.68
This claim (again exclusive of the easement) was settled by defendant for $65 and the entire amount charged to the contractor. The department head’s findings of fact are: (1) that one mesquite tree died as a result of having been run over and was not replaced; (2) that a three-quarters *694 acre garden was destroyed; one-half of this garden was on the right-of-way and one-half off; the one-half which was off the right-of-way was valued at $35 and is chargeable to the contractor; (3) that Mr. Strait’s fence crossed the right-of-way five times; he took two days off from work and saw to it that four of them were taken down and rolled; the fifth was cut and was difficult to replace during the war; (4) that replacement of the fences was not satisfactory; (5) that a ridge had been left, part of which Mr. Strait leveled off, part of which the contractor did.
It is apparent that while the Government, in effect, admits that it is liable for the one-half of the garden which was destroyed, the entire amount of the settlement was charged to plaintiff. As in the other claims dealt with, this is unexplained. The more serious question, however, is whether the Government was liable at all for any damage which the contractor might have done to the garden outside the right-of-way. If not, the contractor cannot be held accountable since the defendant was under no obligation to pay the money expended.
Defendant urges that its payment to Mr. Strait for damages outside the right-of-way is justified because such payments represent its damage for plaintiff’s breach of the following provision of the contract:
RIGHT-OR-WAY
The Government will provide right-of-way as shown on the plans. Any additional right-of-way or easement for transportation of materials and equipment or for storage of materials shall be provided and paid for by the Contractor.
The Contractor shall make all arrangements for use of highway and street right-of-way for storage of materials or operation of equipment and other construction activities, and shall confine his work to the right-of-way and shall he responsible for damages to structures, crops, etc., off the right-of-way. [Emphasis supplied.]
While agreeing that plaintiff was an independent contractor who is normally solely responsible for his torts, defendant urges that the italicized portion of the above provision obligated plaintiff to settle for damages outside the right-of-way *695 and, having failed to do so, defendant was entitled to effect such a settlement and charge plaintiff for the amount thus expended. We do not agree.
Plaintiff has at all times here relevant been solvent and amenable to suit; it offered to put up a bond for $8,000 as evidence of its ability to pay the landowners for any damage which was in fact inflicted; defendant refused this offer and Mr. Koons, the attorney in charge of the settlements for the Government, testified that the claims were never presented to plaintiff. We cannot say that an- agreement “to be responsible” is tantamount to an agreement for extrajudicial settlement by arbitration. Plaintiff was admittedly an independent contractor and defendant has not shown that the situation was one justifying an exception to the established rule that it alone is responsible for damage inflicted on a third person. Since defendant was not liable for the damage outside the right-of-way, its unauthorized settlement on plaintiff’s behalf was improper and the deduction is not allowable.
As to the other items of damages alleged, we are again faced with a situation in which the failure to segregate damages presents an insurmountable obstacle. For the reasons stated in the Morgan settlement, supra, the $65 settlement between defendant and'Mr. Strait was improperly deducted from the contract price.
IY. The G. W. Hatch and the Weil Brothers Settlements
These two settlements present essentially the same questions and will therefore be disposed of together. The claims of these two landowners were for damages to their crops and land due to flooding, said to have resulted from an inordinately high mound of soil left over the pipeline which acted as a levee, preventing normal drainage of adjacent land. Their claims to the investigators are alleged to have been as follows:
(A) G.W. Hatch Claim:
(a) Lost crops In 1945 because of flooding caused by backfill over pipeline_ $2,000
*696 The defendant paid Mr. Hatch $425.28 in settlement of this claim, charging that amount to plaintiff. The department head found as a fact that the ridge across parcel 85, owned by Hatch, was at one time as high as 18 inches, and that flooding resulted. During the trial before a commissioner of this court, Mr. Hatch testified that he had no difficulty with flooding before the ridge was left by the construction, but that since that time he had lost approximately three acres of grain for each of the three years 1944,1945, and 1946. He further testified that the area flooded normally produced 2,000 pounds per acre at a then current value of $2.14 per hundred. There was also evidence that the value of the land itself had been impaired by the retention of water on it for long periods of time with the result that it was, in the words of the witness, “slopped up.” We think the record supports a finding that Mr. Hatch was damaged at least $425.28, and for the reasons set out below defendant was justified in effecting the settlement and charging it to plaintiff’s account.
(B) Weil Brothers Claim:
Weil Brothers owned parcel 33 and in addition to the amount claimed for the easement, allegedly asserted the following claims:
(a) Crop damage by flooding caused by the ridge, 150 acres at $20 per acre for 2 years-$6,000-
(b) Construction of concrete boxes which extended to or above the ground level_ 250
(c) Pasture damage from flooding, 150 acres at $500 per year- 1,000'
' Total_ $7,250
The claim by Weil Brothers was settled by defendant for $474.60, of which $224.60 was charged to plaintiff for the flood damage. Defendant allocated to itself and paid $250' for the concrete boxes which were apparently constructed in conformity with the contract. The department head found as a fact that the ridge left on the Weil section of the pipeline was at least 12 inches in height and that flooding resulted. Mr. Weil testified that 150 acres of pasture and 150 acres of cultivated land were flooded because of the ridge in 1944 and 1945. This included 50 acres of cotton from which 350-pounds per acre could reasonably be expected, as well aa *697 some 40 acres of grain which couldn’t be harvested because of water backed up by the ridge. We think there is ample evidence to support a finding that $224.60 was a reasonable settlement for the damage caused by the ridge. We turn now to our reasons for holding that defendant was justified in making these settlements (Hatch and Weil) and plaintiff’s responsibility therefor.
The Administrator, Federal Works Agency, found that the ridge left over the pipeline on the Hatch and Weil properties was 12 and 18 inches in height, respectively. Under the disputes clause of the contract these findings are binding •on this court. United States v. Wunderlich, 342 U. S. 98. This action by plaintiff was a violation of the contract provision on “Backfill” which provided:
EXCAVATION AND BACKFILL
!¡! * * * *
3. Backjül:
(a) For Cast Iron and Concrete Pipe— * * *
The backfilling shall be brought up uniformly on each side of the pipe and tamped in layers not exceeding six (6) inches in thickness after compaction, until the spring line has been reached. ■
After backfilling has been brought up to the spring line, the layers may be increased to twelve (12) inches in thickness up to one foot above the pipe, above which the backfill material may be rounded up over the trench without tamping. Any excess material over that which will reasonably -fill the trench after settlement may be spread and rounded over the permanent right-of-way to a depth not exceeding 6 inches. Any remaining excess shall be removed by the Contractor and disposed of as approved by the Engineer. In spreading excavated material, drainage shall not be obstructed. Water tamping will not be permitted.
The finished right-of-way shall be smooth. [Italics supplied.]
Plaintiff does not contest the finding that the ridge was more than six inches in height, but argues instead that the italicized portion of the above provision allows the backfill directly over the trench to be whatever height was required to “reasonably fill the trench after settlement.” Assuming, without deciding, that this is a correct interpretation of the *698 provision, it does not materially help plaintiff’s case since there is considerable uncontradicted evidence to the effect that the ridge did cause flooding over a period of two years. Plaintiff had a definite duty not to obstruct drainage. Having found that plaintiff breached the contract by leaving the ridge, the remaining question is whether the Government was rendered liable for the resulting damage to the adjacent landowners and was therefore justified in making the settlement.
Plaintiff’s argument that defendant was not liable for damages done off the right-of-way by an independent contractor is not tenable when applied to the damage caused by interference with the normal drainage of the adjacent property. The rule of the civil law is in force in Texas according to which interference with the natural flow of drainage from another tenement by the owner of adjacent property renders the latter liable for any damage which results. Miller v. Litzerich (Tex. Civ. App.), 49 S. W. 2d 404; Coleman v. Wright (Tex.), 155 S. W. 2d 382; 85 A. L. R. 451. While the grant of an easement includes, by implication, the right to perform such acts as are reasonably necessary to make the grant effective, the holder of the easement cannot make alterations which will injuriously affect the servient tenement. 3 Tiffany On Beal Property, § 810. It appears, therefore, that defendant as the holder of the easement might well have been subjected to suit by the adjacent landowners for the obstruction of natural drainage and the plea that the obstruction was raised by an independent contractor would have been unavailing. Under these circumstances the threat of liability was sufficient to warrant the settlement. The settlement was reasonable, not unrelated to the actual damage incurred by the landowners, and was necessitated by plaintiff’s dereliction. Defendant was therefore justified in withholding $224.60 for the Weil settlement and $425.23 for the Hatch settlement from the contract price.
We conclude that defendant properly withheld $649.83 from the amount otherwise due plaintiff under the contract and that plaintiff is now entitled to recover the $2,350.17 improperly withheld.
*699 There seems very little excuse for this case ever reaching the courts. Sometimes men “drest in a little brief authority”, want tp run not only their own businesses but that of someone else as well. Just why the officials decided they could contract that the plaintiff should be responsible for any damages outside the right-of-way and then feel that they were commissioned to settle with third-party claimants and in doing so use plaintiff’s money without its consent is difficult to understand. This is especially true where the work was fully and satisfactorily performed.
In a maze of conflicting claims and lack of proof there is a temptation to make short shrift and simply say “Pay the'plaintiff for his work.” We think, however, after considering the vague and uncertain testimony and proof of damages, and assumed authority, we have reached a just conclusion, and in doing so have not strayed from the field of established law.
Plaintiff may have judgment for $2,350.17. It is so ordered.
Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
EINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Brown & Boot, Inc., plaintiff herein, is a Texas corporation with its principal offices in the State of Texas. Plaintiff is a general contractor engaged in the construction of various facilities in Texas and elsewhere in the United States of America.
2. It was agreed by contract dated June 29,1943, with the United States of America, acting through the Federal Works Agency, that the plaintiff would construct a 36 inch diameter cast iron water line from Calallen, Texas, to Corpus Christi, Texas, a distance of approximately sixteen (16) miles. A copy of the contract is in evidence and is made a part hereof by reference.
*700 3. Pertinent parts of the contract documents which together comprise the contract are quoted below.
(A) Article 10 of the “Contract Form” provides:
Article 10. Permits and responsibility for work.— The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for all materials delivered and work performed until completion and final acceptance. Upon completion of the contract the work shall be delivered complete and undamaged.
(B) Paragraph 21 (a) of the “General Conditions” of the contract provides:
21. Care of Work.
a. The Contractor shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for the proper care and protection of all materials delivered and work performed until completion and final acceptance.
(C) Paragraph 14 of “Instructions to and Information for Bidders” of the contract provides in part:
14. Defvnitions:
In the specifications and contract documents the titles, Contract Engineer, Construction Engineer, and Owner, used in these documents are defined as follows:
(a) GontraotEngineer: The Engineer/Architect employed under contract by the Owner on non-Federal projects, and by the Federal Works Agency on Federal projects, to furnish Engineering/Architectural services and supervision during the construction period.
* * * * *
Wherever in the specifications reference is made to approval of materials or methods by the Engineer, the same refers to the approval of the Contract Engineer acting under the Regional Engineer.
(D) The Article on “Excavation and Backfill”, page 37 of the “Specifications” of the contract, provides in part as follows:
*701 EXCAVATION AND BACKFILL
1. Description:
* * * * *
Waste material from excavation shall be disposed of as directed by the Engineer. * * *
2. Trench Excavation:
Unless otherwise ordered by the Engineer, all trenches shall be excavated to a width not less than the internal diameter of the pipe plus twelve (12) inches for cast iron pipe and external diameter plus sixteen (16) inches for concrete pipe, and to the depth shown on the plans, with a minimum cover of 3.5 feet.
* * * * *
3. Backfill:
(a) For Gast Iron and Concrete Pipe: After the pipe has been laid and laying approved by the Engineer, the trench shall be backfilled with material free from rocks or boulders.
Care shall be exercised to see that earth is well tamped under the pipe before bringing the backfill up on the sides of the pipe.
The backfilling shall be brought up uniformly on each side of the pipe and tamped in layers not exceeding six (6) inches in thickness after compaction, until the spring line has been reached.
After backfilling has been brought up to the spring line, the layers may be increased to twelve (12) inches in thickness up to one foot above the top of the pipe, above which the backfill material may be rounded up over the trench without tamping. Any excess backfill material over that which will reasonably fill the trench after settlement, may be spread and rounded over the permanent right of way to a depth of not exceeding six inches. Any remaining excess shall be removed by the contractor and disposed of as approved by the Engineer. In spreading excavated material, drainage shall not be obstructed. Water tamping will not be permitted.
The finished right of way surface shall be smooth.
(E) The Article on “Right of Way”, page 43 of the “Specifications” of the contract, provides as follows:
RIGHT-OF-WAY
The Government will provide right-of-way as shown on the plans. Any additional right-of-way or easements for transportation of materials and equipment or for *702 storage of materials shall be provided and paid for by the Contractor.
The Contractor shall make all arrangements for use of highway and street right-of-way for storage of materials or operation of equipment and other construction activities, and shall confine his work to the right-of-way and shall be responsible for damage to structures, crops, etc., off the right-of-way.
(F) The Article on “Clearing and, Grubbing”, page 39 of the specifications, contains the following provisions:
1. General:
Clearing and grubbing shall consist of clearing the right-of-way of all trees, brush, rubbish and other objectionable materials and grubbing within the lines of excavation.
2. Clearing:
All trees and brush to be removed shall be cut even with the surface of the ground and shall be removed from the site of the work and disposed of in a manner satisfactory to the Engineer.
Where ornamental or other trees on the right-of-way are to be preserved, the Contractor shall protect the same from cuts and bruises.
Ornamental trees and shrubs or sod on or along the right-of-way shall be carefully protected from damage, and the Contractor shall employ the services of a nurseryman, approved by the Engineer to care for any such shrubs or trees and shall replace any shrubs or trees which may be damaged or which fail to show satisfactory life and growth during six months after completion of construction under this contract.
4. The Engineer/Architect employed under the contract by the Federal Works Agency to furnish Engineering/ Architectural Services and supervision during the construction period was Myers & Noyes, a firm bf architect engineers of Corpus Christi, Texas, headed by E. L. Myers and E. N. Noyes. The work accomplished on behalf of Myers and Noyes was performed by E. N. Noyes, who was on the job three times every week, and by H. H. Stirman, an Inspector for Myers and Noyes, who at the time of the trial in Corpus Christi was Public Works Director of the City of Corpus Christi, Texas. Plaintiff’s Vice-President, J. M. Dellinger, supervised the performance of the contract for plaintiff.
5. The terrain over which the pipe line was laid consisted *703 of low, rolling hills at the Calallen, or western end of the line, and flat, coastal plains at the Corpus Christi, or eastern end of the line. • ■
6. The contract was signed June 29, 1943, and the pipe lines was completed by the plaintiff on or about November 24,1943. Myers and Noyes, on November 24,1943, executed the “Certificate of the Owner’s Supervising Engineer, Architect, or Bepresentative in Charge” on the final estimate for final payment to the plaintiff on the contract, certifying “that all work and material included in this periodical Estimate have been performed in full accordance with the terms and conditions of the corresponding construction contract documents and authorized changes thereto”. In the letter transmitting this certificate to the Begional Director of the Federal Works Agency, Myers and Noyes stated' “all work has been performed according to contract. We recommend approval of this change order, acceptance of the project, and payment of final estimate.” The pipe line was placed in use and water furnished to the City of Corpus Christi on approximately December 8,1943. By letter dated January 22, 1947, to plaintiff, Myers and Noyes again affirmed the plaintiff’s full completion of the contract, saying:
* * * The project was completed in accordance with the plans and specifications and shortly after December 8, 1943, we rendered a final estimate covering all the work, reported completion of the project, and recommended final payment.
Construction was satisfactory and in full accordance with requirements.
7. By letter dated December 18,1943, the contracting officer’s assistant regional engineer advised plaintiff that $3,000.00 would be withheld from the final estimate on the contract pending the disposition of claims from certain landowners of damage done by plaintiff beyond the 50-foot right-of-way procured by defendant for this water line project.
8. The defendant acquired the 50-foot right-of-way by filing Declarations of Taking in condemnation proceedings and later settled the claims of the landowners for the Government’s taking of the fifty-foot right-of-way permanent easement and damages to the surface on the fifty-foot right- *704 of-way, along with any other claims against the Government, such as for damages caused by Government survey crews prior to the letting of the construction contract to the plaintiff.
9. Some of the landowners, over whose land the pipe line passed, made claims against the defendant for damage done to their properties by the defendant’s surveyors and stakeout parties, for damages to crops on the fifty-foot right-of-way, and various amounts for the right-of-way proper.
10. Five of the landowners presented claims to the defendant for damages allegedly caused by the plaintiff to their land, crops, fences, etc., outside the fifty-foot right-of-way. Most of the damage outside the fifty-foot right-of-way was said to have been caused by water from heavy rains which would not drain off the land because of a ridge which, for a period of nearly two years, was approximately twelve inches high, left over the top of the pipeline by the plaintiff. In some places the ridge was four to six inches high as late as March 1952. Plaintiff made some cuts through the backfill ridge but these were insufficient to prevent the obstruction of drainage. Other damage outside the fifty-foot right-of-way was caused by plaintiff operating heavy pieces of equipment in constructing the pipeline. It was difficult for the plaintiff to operate within the fifty-foot right-of-way because of the use of this heavy equipment and the plaintiff took the position that it would be cheaper to pay for any damages it caused outside the right-of-way than to operate within the right-of-way.
11. Although the plaintiff contractor continued to do business in the Corpus Christi area and advised the defendant that the plaintiff would handle and be responsible for any and all claims which the landowners or anyone else might assert against the plaintiff, the defendant in settling the landowners’ claims against the Government also purported to settle certain unliquidated claims which the landowners were asserting against the plaintiff. These claims were not formally presented to plaintiff prior to these settlements. The defendant awarded to the various landowners lump sums in settlement. Of the sums awarded the respective landowners, the defendant arbitrarily allocated a-certain portion of those *705 lump-sum payments as having been made for damage caused by plaintiff. For instance, as to the claim of Band Morgan, a landowner, the Government paid him $4,044.09, which sum covered the purchase of the Government’s fifty-foot permanent right-of-way and damages caused thereon by the construction of the pipe line and any and all other claims which Morgan had against the Government and its agents, and also for certain damage done by the contractor. Of that lump sum the defendant allocated $1,066.09 to the alleged damage caused by the contractor, and the remainder of the $4,044.09 was allocated to the Government. There is no evidence as to the extent of actual damages suffered by Mr. Morgan. Band Morgan had a claim against the Government for death of cattle due to poisoning which Morgan claimed resulted from the Government’s survey crew, prior to construction, leaving Morgan’s fence gates down. The Government representative testified that he refused to consider this claim and did not allocate any portion of the lump-sum payment made to Morgan as applicable to this cattle-death claim.
12. A summary made by defendant’s witness from the records of the defendant’s investigators is the only evidence of record as to the amounts originally claimed by all the landowners. This summary shows claims for damages both inside and outside the 50-foot right-of-way. The items listed under “Contractor” and “Government” represent the allocations made by the defendant’s agents as to who should bear responsibility for the claims asserted by the landowners. This summary as introduced into evidence is as follows:

Band Morgan

Parcel 21 Contractor Government

(a) 396.4 rods easement_ $396.40
(b) crop damage on 50' easement 7.52 acres at Vz bale cotton at $128.50- 483.16
(e) crop damage on 30 feet_ $288.48
(d) crop damage dne to day being on top soil_ 75.00
(e) cattle killed from eating poisoned cotton_ 500.00 •_
$788.48 $954.56

Parcel 28

141.7 rods easement_ $141. 70
Crop damage to 50' easement_ 172. 83
Crop damage to 30 feet_ $102.80 _
Damage from clay on topsoil_ 26. 80
$102.80 $341.33
*706 Parcel 25 Contractor Government
185.1 rods easement- $185.10
Crop damage on 50' easement_ 225.52
Crop damage on extra 30'- $134.93 -
Damage to land-‘- 35.00
$134.93 $445.62
P/i
229.2 rods easement_ 229.20
Crop damage 50' easement-- 279.49
Damage to crop 30 ft. strip- 166. 40 -
Damage to land- 43.40
$166.40 $552.09

Parcel SI

238.8 rods easement_ 238. 80
Damage to crop 50 ft. easement_ 291.05
Damage to crop 30 ft. strip- 173. 48 -
Damage to land- 45.20
35 acres flooded lands, crops lost- 1,750.00 -
$1,923.48 $575.05

Ira D. Magee

85.92 rods easement- $85.92
Trees destroyed (16)- $320 -
Damage to fences by reason of failure to restore to original condition- 100 -
Damage by reason of stock getting out (mule died)- 80 -
Move concrete and All sinkhole- 150 -
Damage to fence — second tract- 20 -
98 rods easement — second tract- 98.00
$670.00 $183.92

G. W. Hatch

Originally this landowner claimed $1,000 as damages to Ms grain ruined by water held on his land by the ridge left over the pipe line. During the trial of the case Mr. Hatch substantiated at least $464.40 as damages to crops caused by water held on his land by the ridge over the pipe line.

Alva D. Strait

31.68 rods of easements- $31.68
Loss of garden-part on right-of-way and part off right-of-way_ $35. 00 35.00
2 days’ time protecting fence- 15. 00 -
Repair of fence- 15. 00 -
$65.00 $66.68

Weil Brothers

562.9 Rods of easement- $562. 90
Construction of concrete boxes- 250.00
Crop damage by flooding 150 acres at $20 x 2 years caused by ridge-$6,000.00 -
Pasture damage from flooding caused by ridge 150 acres at $500 per year (2 years) _ 1,000. 00 -
$7,000. 00 $812.90
*707 During the trial of this case, Alex Weil, Jr., substantiated damages in the amount of $4,572 to crops of Weil Brothers caused by water held on their land by the ridge left over the pipe line by the plaintiff.
The 16 mesquite trees for which Mr. Magee claimed damages were on the right-of-way.
13. Defendant’s regional counsel tried to get the plaintiff to settle the claims of the five landowners for the damage' caused by the plaintiff outside the fifty-foot right-of-way. Plaintiff took the position that the claims were excessive. However, defendant’s counsel testified that the claims were never presented to plaintiff.
. The following discloses the amounts allocated by defendant, subsequent to the lump-sum payments, as chargeable to the plaintiff with respect to the five landowners who had claims for alleged damage caused them by the plaintiff outside the fifty-foot right-of-way:

Band Morgan

Damage to crops outside 50' right-of-way_ . $866.09
Flooding caused by backfill — drainage obstructed_ 200.00
■ $1,066. 09

Ira D. Magee

For damages claimed in the amount of_$330
plus 16 trees at $20_ 320
a total of_$650
•Settled for--- $289.08
(?. W. Hatch
Damages by ridge causing flooding_ $425.23

Alva D. Strait

Destruction of tree, one-half of garden, fencing not restored left ridge_ $65.00

Weil Brothers

$7,000 flood claims caused by ridge were settled for_ $224.60
14. With regard to disputes the contract provided as follows:
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written *708 appeal by the contractor within 80 days to the head of the department concerned or his dnly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
The plaintiff requested the contracting officer to make a determination of the facts affecting the right of the plaintiff to receive the $3,000 retained to pay the claims of the five landowners for the damage caused by plaintiff outside the fifty-foot right-of-way. The contracting officer advised the plaintiff, in effect, that since he was unable to secure the cooperation of the plaintiff in paying for the damages which the plaintiff had agreed by the contract with the United States to settle, he (the contracting officer) had no other course but to withhold the $3,000 balance.
The plaintiff appealed to the Administrator of the Federal Works Agency from this decision on April 24, 1948, and on May 13, 1949, the Administrator, as the head of the department, affirmed the decision of the contracting officer and rendered the following decision:
I find that the Division Engineer has been extremely reasonable in his treatment of the contractor. The Division Engineer gave ample notice to the contractor of the existence of the landowners’ claims. In failing to obtain an agreement from the contractor before proceeding to settle the claims, the Division Engineer merely was attempting to expedite action to protect the rights of innocent landowners damaged by the contractor’s breach of its contract with the Government.
ifc « * * *
The next question is the measure of damages as the result of Brown and Root’s breach of contract. If the landowners had been suing Brown and Root there is good evidence that the damages claimed would have amounted to several thousand dollars, with one estimate in the file running to $16,000.00. We regard that estimate as excessive however. Inasmuch as the withholding is based on a breach of the contract between the Government and Brown and Root the damages are not the entire amount of damage suffered or claimed by the landowners but the amount for which the Government could buy its peace for those items which were a *709 violation of the contract with the Government. In this connection, the Division Counsel, Mr. Boons, thought he had an agreement with Brown and Boot whereby Brown and Boot would pay $2,000.00, and, accordingly, he proceeded to settle the landowners’ claims for as near that sum of money as possible.
Mr. Band Morgan owned or represented persons owning 1,191.2 rods of easements, comprising parcels 21, 23, 25, 26, and 31. Mr. Morgan asserts, and from our investigation I find, that the contractor used an 80-foot strip of ground instead of the 50-foot right-of-way authorized under the contract. The applicable contract provision (page 43 of the Specifications) stated “Any additional right-of-way or easements for the transportation of materials and equipment or for storage of materials shall be provided and paid for by the Contractor.” Since no payment for the extra land used was made by Brown and Boot, this resulted in a contract violation. As a result of such damage, the Government was required to pay $866.09, which was the amount agreed upon with Mr. Band Morgan as the value of the crops damaged on the 30 feet outside the 50-foot right-of-way.
_ I .further find that the backfill was not leveled to a six-inch depth as required under “Backfill” on page 38 of the Specifications. I find that as a result of leaving a mound in excess of six inches and that as a result of leaving the backfill in such a condition that drainage was obstructed in violation of the provisions of the Specifications reading “In spreading excavated material, drainage shall not be obstructed”, we were obligated to pay Mr. Band Morgan $200.00 damages. Accordingly, I find that as a result of the contractor’s breach of contract we were obligated to pay $1,066.09 which it otherwise would not have been necessary to pay.
Specific attention is directed to the fact that by this, and subsequent findings in this letter, I do not purport to determine Brown and Boot’s liability to Band Morgan or others. As $1,066.09 was the amount of damage caused the Government as a result of Brown and Boot’s breach of contract with the Government, that is the measure of the Government’s damages. The question of the liability, if any exists, of Brown and Boot to others is outside the scope of the finding. If Brown and Boot caused damage to others, that is their responsibility. If they are sued, this finding does not purport to determine all damages to the landowners. It merely defines those which were also a breach of Brown and Boot’s contract with the Government.
*710 Mr. Ira D. McGee, owner of parcel 6, required the contractor to pay $100.00 as compensation for moving his stock-pen to a location clear of the easement. In addition Mr. McGee had other claims. The Government was required to pay Mr. McGee $289.08 in addition to the value of the right-of-way for the following items.
The concrete floor of his stock-pen was broken up, dragged off the easement (about which there is no complaint) , but was left on the corner of Mr. McGee’s property, about which he did complain. This act was in distinct violation of the Specifications, page 42, under “Cleaning Up,” which reads “As the various items of work are completed the contractor shall clean up all debris and waste from the work and dispose of the same at his expense.”
Mr. McGee charges that a ridge fully 12 inches high was left except in one place where the ground settled leaving a breach 6 to 10 inches deep and 15 feet long. For the sink-hole and the removal of the concrete Mr. McGee asked $150.00.
In addition McGee stated that although the contractor agreed to protect the mesquite trees forming a grove in his pasture, 16 were cut. They were 15 to 20 years old, and valued at $20.00 each, or $320.00. This action by the contractor was in direct violation of the Specifications, gage 39, the last paragraph under “Clearing and ■rubbing” which reads:
“Ornamental trees and shrubs or sod on or along the right-of-way shall be carefully protected from damage, and the Contractor shall employ the services of a nurseryman, approved by the Engineer, to care for any such shrubs or trees and shall replace any shrubs or trees which may be damaged or which fail to show satisfactory life and growth during six months after completion of construction under this contract.”
I find this action was in violation of the contract with the Government.
I further find that the contractor failed to restore certain fences as required on page 40 of the Specifications under “Fencing”:
“The Contractor shall do the necessary removing of fencing on the right-of-way and rebuild same after the pipe line work is completed. The fences shall be rebuilt of the same character of materials as that which was removed. All posts, wires and *711 other material shall be sound, straight, equal to or better than the materials removed. Fences shall be built to line, posts well set, wires fastened with new staples and. well stretched.
“All new posts used in the fencing shall be new Cedar posts, buried at least thirty (30) inches in the ground, and shall have a top diameter of not less than four (4) inches. New corner posts shall have a minimum top diameter of not less than 6 inches.”
McGee claimed $100.00 for the damage.
The Government settled its responsibility for all these elements of damage for $289.08, which, accordingly, are the damages suffered by the Government for these breaches of contract.
I find that the contractor left a ridge on the land of Mr. G. W. Hatch, parcel 35, which caused flooding. This ridge at one time was as high as 18 inches. Damages as a result of the contractor’s noncompliance with the provisions of the contract under “Backfill” (page 38 of the Specifications) were $425.23.
Alvin S. Strait {sio) owned parcel 8. One mesquite tree died as a result or being run over and was not replaced, notwithstanding the provisions of the Specifications, page 39, the last paragraph under “Clearing and Grubbing”, quoted above. Mr. Strait had a % acre garden, one-half of which was outside the 50-foot right-of-way. This was destroyed, and the y2 chargeable to the contractor under the provisions of the first paragraph under “Bight-of-Way” on page 43 of the Specifications, is $35.00. Further, Mr. Strait’s fencing crossed the right-of-way 5 times. He took two days from work and saw to it that 4 of them were taken down and rolled. The fifth was cut and it was difficult to replace it in view of shortages during the war. This treatment of the fence was in direct violation of the first two paragraphs of “Fencing” on page 40 of the Specifications. Beplacement of fences was not satisfactory. A ridge had been left, part of which Mr. Strait leveled off, part of which the contractor did. For all these items of damage in violation of the contract the Government had to pay $65.00 in addition to the value of the easement.
Weil Bros, owned Tract 33. The contractor left a ridge at least 12 inches high over the pipeline where it crossed this area. The owner was also caused loss by 2 valve boxes which extended, one above and one nearly to, the surface. The owner claimed $250 damage because *712 of these two boxes, $7,000.00 damages as a result of the ridge. Of the $474.60 extra paid the contractor, $250.00 was allocated to the valve boxes and paid by the Government, and $224.60 to damage to crops because of the ridge.
This results in an aggregate loss to the Government resulting from your breach of contract, as follows:
Morgan. $1,066.09
McGee 289. 08
Hatch 425.23
Strait 65. 00
Weil 224. 60
* $2,069.40
Accordingly, I hereby find under Article 15 of your contract that of the $3,000.00 now withheld by the Government, the contractor is entitled to receive the amount of $930.60 and such sum shall be promptly paid upon presentation to the Federal Works Agency of a duly certified voucher.
Sincerely yours,
Sgd. Philip B. Fleming,
Administrator, Federal Worhs Agency.
15. On May 9, 1947, plaintiff’s attorney suggested that the $3,000 withheld from the plaintiff be relinquished by the defendant in exchange for a bond in that amount as security in view of the contract provision that the contractor “shall be responsible for damage to structures, crops, etc., off the right-of-way.” On May 21, 1947, the division counsel replied that he was not agreeable to advising the contracting officer that any sum should be paid to the plaintiff at that time, as the law required that he withhold payments in a sufficient amount to protect the Government’s interest.
16. The method followed by defendant in settling the'' claims of those who suffered financial loss through the taking of their property resulted in lump-sum awards by the defendant for certain claims which it deemed to be valid against both plaintiff contractor and the defendant. With the exception of the Hatch and Weil settlements there is virtually no evidence as to actual damage suffered by the landowners. *713 The plaintiff was charged for that portion of the settlement which defendant’s agents allocated to it subsequent to the lump-sum payments. With the two exceptions noted above, the factual basis for this allocation does not appear in the record.
17. The receipt given by the landowners upon the payment of the lump-sum read as follows: [The Magee receipt is illustrative]
Receipt is acknowledged of Registry Check No. 9569 dated November 7,1947 in the amount of $289.08 payable to Ira D. Magee and Mrs. I. D. Magee, which represents full payment of any and all claims for compensation due for the taking of parcel No. 6.
It does not affirmatively appear that plaintiff received releases from the landowners for all claims which they might have against it.
18. Defendant’s attorney in charge of these settlements, Mr. Koons, was anxious to effect a settlement with the landowners as to all claims they had in connection with the pipeline construction in order to avoid litigation and a jury verdict on just compensation for the taking of the easements referred to in finding 8.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the- court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States two thousand three hundred fifty dollars and seventeen cents ($2,350.17).

 See finding 14.

 This “summary of the investigators’ records” is used for want of any other evidence on the question of what the landowners asserted in their original claims. The summary was made by defendant’s witness, Mr. Koons, on the day before- trial and was allegedly taken from certain, records of the Federal Works Agency. Its quotation here is for the purpose Of showing the state of defendant’s evidence rather than for its probative value in establishing the truth of the assertion made therein.

 The reference Is to the “findings of fact” by which we are hound and not the numerous conclusions of law found therein.

 Except for the Morgan settlement, the record Is not clear as to just what the settlements included. The only receipt in evidence re the Magee settlement is for $289.08. but there is some indication that payment for the easement was made separately.

 It will be noted that as to the last two items the department head merely found that Magee stated or charged and not that the statements were true.

 Error in addition — correct figure is $2,070. The figure of $930.60 in the next paragraph should be $930.